# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 2000 Session

## STATE OF TENNESSEE v. RANDALL E. BEST

### Appeal from the Criminal Court for Monroe County
#### No. 97-003    Carroll L. Ross, Judge

---

### No. E1999-00120-CCA-R3-CD
### September 26, 2000

---

The defendant, Randall E. Best, appeals his first degree murder conviction and the resulting sentence of life without parole. He contends: (1) that the evidence is insufficient to show premeditation and deliberation, (2) that certain photographs of the victim were inadmissible at the sentencing phase of the trial, and (3) that the felony murder aggravating circumstance does not sufficiently narrow the class of death-eligible offenders when the jury convicts the defendant of both premeditated murder and felony murder. We hold that the evidence is sufficient, that the challenged photographs are admissible because they are relevant to the aggravating and mitigating circumstances, and that the jury properly based the defendant's sentence on the felony murder aggravator. We affirm the trial court's judgment of conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Kimberly A. Parton, Knoxville, Tennessee (at trial and on appeal) and William C. Tallman, Knoxville, Tennessee (at trial) for the appellant, Randall E. Best.

Paul G. Summers, Attorney General and Reporter; Clinton J. Morgan, Counsel for the State; Jerry N. Estes, District Attorney General; Richard Carson Newman, Assistant District Attorney General; and Jon Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Randall E. Best, appeals as of right his convictions by a jury in the Monroe County Criminal Court for first degree murder and especially aggravated burglary. The defendant received a sentence of life without parole on the murder count. He does not challenge his especially aggravated burglary conviction in this appeal. The defendant contends: (1) that the evidence is insufficient to show premeditation and deliberation, (2) that the trial court should not have admitted

certain photographs of the victim in the sentencing phase, and (3) that the felony murder aggravating circumstance does not sufficiently narrow the class of death-eligible offenders when the jury convicts the defendant of premeditated murder and felony murder alternatively. We affirm the trial court's judgment of conviction.

The defendant was indicted for especially aggravated burglary, premeditated and intentional murder, and felony murder for the November 1996 beating and subsequent death of eighty-seven-year-old Ben Ray. The defendant's ex-wife, Brenda Best, was charged with aggravated burglary and separate counts of premeditated and felony murder relating to the victim's death. The trial court allowed her to sever her case from that of the defendant, and she invoked her Fifth Amendment right not to incriminate herself when called to testify at the defendant's trial.

Frank Ray, son of the victim, testified as follows: At 1:14 a.m. on November 13, 1996, the telephone rang in his Knoxville home, and his father's telephone number appeared on the caller identification box. His father's telephone was programmed to allow his father to push one button to call any of his seven children, and the first button dialed Mr. Ray's phone number. Mr. Ray answered the telephone, heard silence on the line for three or four minutes, and then faintly heard his father saying, "Come here, come here, come here." Mr. Ray immediately called Jo and Len Peterson, his sister and brother-in-law, who live near his father in Vonore, Tennessee. The Petersons said they would check on his father.

Leonard Peterson, the victim's son-in-law, testified as follows: He and his wife, JoAnn, lived one-half mile from the victim. In November 1996, the victim was eighty-seven years old and had lived alone since his wife died one and one-half years earlier. Mr. and Mrs. Petersen checked on the victim everyday, brought him his meals, and made sure he took his medicine. The Petersens received a telephone call at 1:18 a.m. on November 13, 1996, and they immediately dressed and drove to the victim's house. The rear storm door was locked, but the inside door was standing open. Mr. Petersen knocked repeatedly, but no one answered. He pulled the storm door off its hinges, and he and Mrs. Petersen went into the victim's house. He saw blood on the victim's bed and on the floor in the hallway. They found the victim on the floor in the guest bedroom, curled into a fetal position and moaning, "Help me." Blood was on the door and the floor. Mr. Petersen called 9-1-1, and the police arrived within four minutes. The front and side doors to the house were locked with a chair propped underneath each of them. The center window on the back of the house appeared to have been disturbed, and the screen was damaged.

The testimony of JoAnn Peterson, the victim's daughter, was essentially the same as that of her husband. She said that she noticed a bloodstain in the shape of a footprint in the hall. She said that when she entered the guest bedroom, she noticed that a drawer had been emptied onto the bed and a lamp had been knocked off the linen cabinet. She said that the victim had blood on his hair and forehead and swelling over his left eye. She said that the victim was fully dressed except for shoes, noting that the victim sometimes slept in his clothes. She said that the screen on the back window and the table under the window were broken. She said that the victim was taken to the hospital and died two days later.

Mrs. Peterson testified that the victim was wearing his watch and ring. She said that the emergency personnel gave her the victim's wallet and keys. She stated that the wallet contained more than four hundred dollars and that the hospital personnel found nine hundred dollars in the victim's shirt pocket. She said that the victim normally hid large amounts of money around his house, but she had no personal knowledge that anything had been taken from the house.

Jeff Lashley testified as follows: In November 1996, he was the chief of the Vonore Police Department and was called to the victim's home. He saw a large amount of blood on the walls in the hall separating the two bedrooms and what appeared to be a trail of blood leading to the spare bedroom. The victim had blood on his face, hands, and body; severe facial and head trauma; and defensive wounds on his hands and arms. The victim was wearing slacks, a t-shirt, a flannel shirt, and a sweater. He asked the victim if he knew who did this to him, and the victim said, "Help me; help me; just kill me; help me." The screen in the rear window appeared to have been pulled out, and he found pry marks on the bottom of the window sill. The furniture near the rear window was knocked over as though someone had crawled through the window. Later that morning, he noticed broken blocks in the retaining wall outside the victim's house.

Rudy Trejo, an ambulance service employee, testified as follows: He arrived at the victim's home at approximately 1:30 a.m. He saw blood on the floor and on the lower three feet of the walls. The victim was in shock and was babbling. The victim had blood on his hair and face, and his eye was lacerated and swollen. He tried to calm the victim and drove him to Sweetwater Hospital.

Mike Blankenship, another ambulance service employee, testified as follows: The victim had been hit in the face with a blunt object. The victim's nose was broken and bleeding, and his left eye was swollen shut. The victim had lacerations above his right eye; marks on his right cheek, face, and lips; and torn skin on his arms as if he had been struggling or rolling. The victim was wearing several layers of clothing.

Lisa Scruggs testified that she treated the victim at the hospital on November 13th and overheard the victim say to his son, "Get her off me." She said that at the time, she was standing at the victim's head and attending to his injuries. The parties stipulated that two other medical personnel would testify that they overheard this same comment.

Jim Kyle testified as follows: In November 1996, he was a deputy sheriff with the Monroe County Sheriff's Department. Around 8:15 a.m. on November 13, 1996, he received a dispatch regarding an individual passed out in a car and possibly intoxicated. He came upon the defendant, who was either passed out or asleep in his car. The defendant was covered in what appeared to be blood and smelled strongly of alcohol. Deputy Kyle administered several field sobriety tests, and the defendant performed very poorly. He believed the defendant to be intoxicated and arrested him.

Patrick Upton testified as follows: On November 13, 1996, he was a detective with the Monroe County Sheriff's Department and knew the defendant both personally and professionally. Around 8:00 or 9:00 p.m. on the night of the beating, the defendant drove to his house and blew the

car horn. He told the defendant that he would take care of any business at the sheriff's department the next day but not at his home, and the defendant left. He did not give the defendant time to explain what he wanted, but he later learned that the defendant wanted to discuss helping uncover drug activity. A woman was with the defendant, and the defendant did not appear to be intoxicated. The next morning, he saw the defendant at the detectives' office. Detective Upton identified a photograph of the defendant taken that morning, showing a cut on the defendant's left temple and blood on the defendant's hands. He swabbed the defendant's hands to collect a sample of the blood.

Shawn Hughes testified as follows: In November 1996, he was a crime scene technician and patrolman with the Vonore Police Department. He processed the defendant's car and found damage to the rear bumper as if someone had backed into concrete. He recalled damage to the retaining wall at the victim's house at about the same height as the defendant's bumper. He found blood on the interior handle of the driver's side door, the horn button on the steering wheel, the kickplate of the front passenger-side door, the passenger's armrest and doorframe, and the trunk. He recovered blood and fibers from the driver's-side floor mat. He found a tire tool in the front passenger-side floorboard. He found a prescription bottle for dilantin, which contained fourteen pills, and an empty prescription bottle for phenobarbital. He found a package of sanitary napkins and panties on the rear floorboard.

Linda Littlejohn, a forensic scientist, testified that fibers on the defendant's shoes were consistent with a throw rug from the victim's house. She said that fibers found on the passenger-side floor mat in the defendant's car were consistent with shag carpet from the victim's house. Samera Zavaro, from the Tennessee Bureau of Investigation (TBI) crime laboratory, testified that the swabs of the defendant's hands, the tire tool, and both of the defendant's shoes tested positive for human blood. Margaret Bash, an expert in DNA analysis, testified that DNA from the blood found on the defendant's hands matched the victim's DNA. She said that the odds of the blood belonging to someone other than the victim were one to twenty-three million.

Dr Charles Harlan, a medical doctor, testified as follows: He performed the autopsy of the victim. He believed that the victim received between thirty and forty blows. The victim had bruises on his chest, arms, and eyes. The victim sustained lacerations on his head, both eyes, and his hands. The injuries to the victim's head were caused by a hard linear object, such as a tire tool. The victim's right earlobe was almost torn off, and he sustained defensive wounds to his hands. The victim's ribs were fractured, which could have been caused by a foot or a shoe. The victim suffered considerable internal bleeding around his fractured ribs. The victim had a pacemaker. A normal person would have felt considerable pain and would have remained conscious during the beating. Death was caused primarily by shock resulting from the victim's injuries, particularly the blunt trauma to the victim's right chest.

TBI Agent T.J. Jordan testified that on the evening of November 14, 1996, he learned that the defendant wanted to make a statement. He said that the defendant signed the form waiving his rights at 8:51 p.m. He said that he took notes while interviewing the defendant and then wrote out a chronological statement from his notes. He said that the defendant reviewed the written statement

and then signed it. He stated that the defendant also made an affidavit affirming that he had read and understood the statement and that it was true. He said that the defendant was very willing to give the statement and that he was there at the defendant's request. He said that the defendant seemed protective of Brenda Best in a self-serving way. He said that although the statement referred to Ms. Best as the defendant's wife, they were actually divorced at the time.

Agent Jordan testified that it is the TBI's policy to make written rather than recorded statements. He said that he allowed Kenny Hope, a jailer, to stay in the room during the interview to make the defendant feel more comfortable. He said that unbeknownst to him, Mr. Hope was taping the interview with two microcassette recorders. He said that once he discovered the recorders, he confiscated the tapes as evidence and gave them to the Vonore Police Department.

Agent Jordan read the defendant's statement into evidence. The statement related that the defendant was driving alone on the night of the offenses and was mad at the victim because he suspected the victim of "messing around" with his wife. He entered the victim's house through a window, carrying a tire tool. The victim was in bed asleep, and without saying anything, the defendant hit the victim on the head a couple of times with the tire tool. The defendant stated that he went there to hurt the victim, that he wanted to kill him, and that he "just got crazy." The victim hit the defendant on the forehead. The defendant continued to hit the victim as he crawled away. The victim begged the defendant not to kill him, and the defendant stopped hitting the victim. The victim was conscious when the defendant left, and the defendant heard a telephone recording as he was leaving. The defendant tried to leave through the back door but could not. He left through the same window. The defendant backed his car into something as he was leaving. The defendant stated that he was drunk when he went to the victim's house but that he knew what he was doing.

Sam Tackett, the lead investigator on this case, testified that he took the defendant to the hospital for a blood sample and that the defendant was very cooperative. He testified that the police collected a woman's white slip from the victim's home and some sanitary napkins from the trash can in the victim's bathroom. He said that on November 16th, Brenda Best gave him the pants, shirt, and undergarments that she wore on the day of the offenses. He said that Agent Jordan gave him the tapes of the defendant's interview but that he did not log these tapes as evidence because he knew that the TBI did not use audiotapes of interviews. He said that he put the tapes in his desk without listening to them and that he did not know what happened to them.

The defendant testified that he had rented a home from the victim and that he and the victim had not had any problems. He said that he had been drinking for two days before the offense and had attempted to commit suicide by taking phenobarbital. He said that at the time, he and Brenda Best were divorced but that he still called her his wife and they still lived together. He said that Ms. Best told him that she was going to clean the victim's house. He said that he drove her to the victim's house and returned two hours later. He said that he went to the victim's back door, but he did not see or hear Ms. Best or the victim. He said that he decided to sneak inside because he wanted to know what Ms. Best and the victim were doing. He said that he retrieved a tire tool from the front

floorboard of his car and used it to open the window quietly. He said that he crawled through the window and went to the bedroom.

The defendant testified that Ms. Best was naked and was lying on the bed between the victim's legs. He said that he thought that Ms. Best was performing oral sex. He said that Ms. Best had previously told him that the victim made passes at her on earlier occasions and had offered her money in exchange for oral sex. He said that he yelled at them, that Ms. Best began dressing and ran out of the room, and that the victim started pulling up his pants. The defendant said that he was angry and began hitting the victim. He said that the victim was saying, "Get her out of here" or "Get her away from me." He said that he hit the victim six to eight times with the tire tool and that the victim also hit him. He said that the room was dark and that he did not think that he was really hurting the victim. He said that he did not see any blood. He said that he did not beat the victim throughout the house and did not know how blood got everywhere. He said that Ms. Best was yelling from another room that they should leave. He said that when the victim said, "Please don't kill me," he saw the blood, got scared, and left the room. He said that he and Ms. Best left through the window because they could not get the door opened.

The defendant testified that his statement to the TBI agent differed from his testimony because he did not want to involve Ms. Best. He said that he did not want the victim's family to know what the victim was doing that evening but that he had to tell the truth. He said that he lied in his statement when he said that he went there to hurt the victim. He said that the TBI agent lost the interview tapes because the agent had changed the defendant's statement. He said that when the agent read the statement to him, he knew that the agent had added information, but he did not care at the time because he knew that what he did was unforgivable. The defendant denied kicking the victim and said that he did not know how blood got on the bed. He said that he did not go into the house to attack the victim but that he just went crazy. He said he did not mean to kill the victim.

In rebuttal, Doug Watson, the Sheriff of Monroe County, testified that he read the defendant his rights while the defendant was in his office waiting for the TBI agent to arrive. He said that the defendant told him that he went to the victim's house to hurt him because he thought that the victim was fooling around with his ex-wife. He said that the defendant told him that he took Ms. Best to her mother's house that night.

Kenny Hope testified that he and the defendant were friends and that he had known the defendant for twenty-six to twenty-eight years. He said that he was present during the defendant's interview and that nothing in the defendant's statement conflicted with what the defendant said during the time that he was recording the interview.

Based upon the foregoing evidence, the jury found the defendant guilty of especially aggravated burglary and of both premeditated murder and felony murder. The trial court merged the two murder counts into a single conviction for first degree murder. The jury sentenced the defendant to life without parole based upon its finding that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and that

the defendant knowingly committed the murder while he had a substantial role in committing aggravated burglary.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his first degree murder conviction because the state has failed to prove premeditation and deliberation. He argues that the evidence shows that he acted out of passion because he believed that the victim was having sexual relations with his ex-wife. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

First degree murder is the "premeditated and intentional killing of another" or a killing committed during the perpetration of certain enumerated felonies, including burglary. Tenn. Code Ann. § 39-13-202(1)-(2). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

The defendant contends that the evidence shows that he acted out of passion rather than with premeditation when he attacked the victim. The defendant argues that both his sworn statement and his trial testimony show that he was angry with the victim because he believed that the victim and Brenda Best were involved in a sexual relationship. He states that Sheriff Watson also testified that the defendant told him that the defendant suspected that the victim and Ms. Best were having an affair. He also argues that the charges against Ms. Best suggest that the state's theory of the case

places Ms. Best at the scene of the crime, playing an active role in the victim's death. Finally, he points to the woman's slip and the sanitary napkins found in the victim's house as proof of Ms. Best's presence at the scene.

Viewing the evidence in the light most favorable to the state, the defendant's statement reveals that he went to the victim's house intending to hurt the victim and broke into the house through a window while the victim was sleeping. Without saying a word, the defendant began hitting the eighty-seven-year-old victim with a tire tool. The statement shows that the defendant continued to hit the victim as he crawled away. Dr. Harlan, who performed the victim's autopsy, testified that the victim received thirty to forty blows. In his statement, the defendant says that once he began hitting the victim, he wanted to kill the victim. Although at one point in the statement, the defendant says that he just "got crazy," the weight and value to be given the evidence is a determination for the jury. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The jury could reasonably believe that the defendant acted with premeditation based upon the remainder of the statement.

Furthermore, the jury found the defendant guilty of felony murder. Especially aggravated burglary involves the burglary of a habitation and serious bodily injury to the victim. Tenn. Code Ann. § 39-14-404(a)(1)-(2). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . not open to the public, with intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(1). At trial, the defendant testified that he retrieved the tire tool from his car, quietly pried open the window, and crawled inside. The evidence reveals that once inside, the defendant hit the victim thirty to forty times with the tire tool and that the victim died two days later from the injuries sustained in the beating. The defendant argues that he entered the victim's house only to see what the victim and Ms. Best were doing and that he did not intend to commit an aggravated burglary until he was inside and saw Ms. Best naked. In the light most favorable to the state, the defendant's statement reveals that the defendant went to the victim's house intending to hurt the victim and that he wanted to kill the victim. He entered the house with the tire tool in his hand. Thus, the evidence is also sufficient to support the conclusion that the defendant entered the house with the intent to kill the victim. This justifies a conviction for felony murder.

## II. ADMISSIBILITY OF PHOTOGRAPHS

The defendant contends that at the sentencing phase of the trial, the trial court erred in admitting a photograph of the victim at a family reunion, photographs depicting the victim's injuries, and a photograph depicting the victim wearing a belt and suspenders while being transported to the ambulance. The defendant argues that these photographs were not relevant to prove an aggravating circumstance. The state contends that the photographs are relevant to the circumstances of the offense being heinous, atrocious, and cruel. The state alternatively argues that even if the trial court erroneously admitted the photographs, any error is harmless in light of the evidence that the defendant senselessly killed the victim by beating him with a tire tool.

Initially, the state questions whether the defendant objected to the admissibility of the contested photographs at trial. Before the sentencing hearing, the state renewed its request to enter

the photographs of the victim's injuries that the trial court had excluded in the guilt phase of the trial. The state also requested that it be allowed to enter a photograph of the victim taken at a family reunion two months before the offenses in order to show the extent of the victim's injuries. The defendant objected under Rule 403, Tenn. R. Evid., that these photographs were autopsy photographs and would serve only to inflame the jury. The trial court found the photographs to be admissible because they related to the aggravating circumstance that the murder was especially heinous, atrocious, and cruel. Although neither party referred to the photographs by their exhibit numbers, the record reflects that the defendant did object to the admissibility of the photographs showing the injuries to the victim and of the photograph of the victim on the gurney, claiming that it was irrelevant to the aggravating circumstances at issue. However, the defendant did not mention the photograph of the victim taken two months before the attack nor did he object when it was admitted into evidence.

Generally, the admissibility of photographs is a matter left to the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent a clear abuse of discretion. State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Nevertheless, photographs admitted during the guilt phase must be relevant to an issue at trial, and the danger of unfair prejudice must not substantially outweigh their probative value. Tenn. R. Evid. 403; see Banks, 564 S.W.2d at 951. On the other hand, the admissibility of evidence in the sentencing phase of a capital case is governed by Tenn. Code Ann. § 39-13-204(c):

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

This means that evidence relevant to sentencing in a capital case is admissible, subject only "to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations." Hall, 8 S.W.3d at 602 (footnote omitted).

Arguing that the photographs were irrelevant and unduly prejudicial, the defendant contends that the trial court did not apply the proper standard in admitting the photographs but, instead, found the photographs automatically admissible at the option of the state in the sentencing phase. The defendant bases this assertion upon a statement made by the trial court during the discussion of the photograph of the victim on the gurney. The state argued that this photograph, which depicts the victim wearing suspenders and a belt on the night of the offenses, showed the atrocious nature of the

defendant's story that he caught the victim having sexual relations with Ms. Best. It also argued that the photograph would not inflame the jury because it revealed no more of the victim's injuries than the other pictures already seen by the jury. The court agreed that the photograph would show the jury nothing more than it already knew because the defendant had testified that the victim put on his pants. After hearing the state's argument regarding the victim's ability to fasten his suspenders and the defendant's objection to the photograph, the court stated:

> Well, I think it could go to the atrocious cruelty of the act. Again, you know, I've stated here all week . . . why I didn't think some of these photographs were needed, because I feel and still feel the proof is so considerable. And I would point out again, the Courts do not find harmless error . . . on death penalty cases. . . . Now that's your decision from this point on. I've kept these photographs out of this entire trial. I have felt that the proof is so strong the State doesn't need them. We've argued all week about it, and I'm going to let [the state] put them in now. If you want them in, you put them in. It's that simple.

The defendant claims that this statement shows that the trial court found the photographs to be virtually automatically admissible in the sentencing phase.

The trial court did not automatically admit the photograph of the victim on the gurney. Although the court believed that the state's proof of the aggravating circumstance was more than sufficient even without this photograph, it based its determination that the photograph was admissible upon the photograph's relevance to the cruelty of the act and to the defendant's argument that the jury should mitigate the defendant's sentence if they had any lingering doubt regarding his guilt. We question the trial court's finding that the photograph depicting the victim wearing a belt and suspenders was relevant to the cruelty of the act. The heinous, atrocious, and cruel aggravator relates to the murder being "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-14-204(i)(5). It does not relate to the defendant's explanation of his actions or his comments on the character of the victim.

However, the trial court properly found that the photograph of the victim on the gurney was relevant to the defendant's proposed argument on lingering doubt. Pursuant to Tenn. Code Ann. § 39-13-204(c), any evidence relevant to the punishment, including evidence of "the nature and circumstances of the crime" and "any evidence tending to establish or rebut any mitigating factors," is admissible. The defendant requested and the trial court charged the jury on the following mitigating circumstance:

> You may consider any residual or lingering doubt you may have about the defendant's guilt. You have already found beyond a reasonable doubt and to a moral certainty that the defendant is guilty. Lingering or residual doubt differs from reasonable doubt. It may reflect a mere possibility. The absence of an absolute certainty about guilt can be considered in mitigation.

The defendant testified that when he entered the victim's bedroom and yelled at the couple, the victim began fastening his pants. The fact that the eighty-seven-year-old victim was wheeled to the ambulance fully clothed and wearing both a belt and suspenders is relevant to rebut any lingering doubt that the jury might have possessed.

The trial court erred in relying solely upon relevance in making its determination to admit the photograph of the victim on the gurney. At the sentencing hearing, the defendant argued that the photograph was unduly prejudicial because it related only to the guilt of the defendant and not to the appropriate punishment. Constitutional due process protections relating to the fundamental fairness of the trial continue to apply in the sentencing phase of a capital case, and the trial court should have addressed whether the photograph was unduly prejudicial. On the other hand, the defendant failed to explain how this photograph was prejudicial, other than restating his argument that it was irrelevant. The photograph was not gruesome, and, in fact, the victim's head was cropped from the photograph leaving only his clothed body on the gurney for the jury to see. The trial court properly admitted this photograph.

The defendant contends that the photographs showing the victim's body immediately before the autopsy were not relevant to an aggravating circumstance because the jury was aware of the nature and extent of the victim's injuries from the testimony of Dr. Harlan. The defendant summarily argues that these photographs were unduly prejudicial and more shocking because they were shown at the sentencing phase rather than the guilt phase. The state contends that these photographs relate to whether the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse. Our supreme court addressed this argument in State v. Hall, 8 S.W.3d 593 (Tenn. 1999). In Hall, the defendant contested the admission of autopsy photographs showing the victim's external injuries, arguing that they were cumulative to the doctor's testimony during the guilt phase of the trial. The court held that the photographs illustrated the doctor's testimony, were "highly relevant to the extent of abuse" that the victim suffered before she died, and were not gruesome to the extent that they would have inflamed the jury. Id. at 602. For similar reasons, the photographs in the present case were relevant and admissible to show torture or serious physical abuse. See Tenn. Code Ann. § 39-13-204(i)(5).

Finally, the defendant argues that the photograph of the victim two months before the offenses was not relevant to show the victim's previous appearance because no question existed that the victim sustained the injuries as a result of the beating by the defendant. He contends that this photograph could only serve to inflame the passions of the jury. The state responds that the jury was entitled to see the victim's condition before the offenses. As previously noted, the record does not reflect a specific objection to or argument about this photograph. Also, even with a broad view of the defendant's objections, the record fails to disclose any argument for or against the admission of that picture. In this respect, it is difficult to question the trial court's decision to admit the photograph. In any event, although we question whether the photograph adds any value to illustrate the extent of the victim's injuries, given its lack of clarity and the clarity of the photographs of the victim's wounds, we cannot say that its admission appears to have affected the sentence imposed.

-11-

### III. FELONY MURDER AGGRAVATING CIRCUMSTANCE

The defendant contends that the use of Tenn. Code Ann. § 39-13-204(i)(7), the felony murder aggravating circumstance, does not sufficiently narrow the class of death-eligible offenders when the jury has found the defendant guilty of both premeditated and felony murder. He argues that the jury might be uncertain about how to apply and weigh the felony murder aggravating circumstance in this situation. The state contends that the issue is without merit because the trial court charged the jury only on the premeditated murder conviction at the sentencing hearing. We agree, but we also note that the need to narrow the class of death-eligible offenders to comply with the constitutional protection against cruel and unusual punishment is not implicated in cases that do not involve the death penalty. See State v. Butler, 980 S.W.2d 359, 361 (Tenn. 1999). "The felony murder aggravator (i)(7) can be used to enhance a sentence to life without the possibility of parole when the defendant is convicted of felony murder." Id. at 363. The jury properly applied the felony murder aggravator.

In consideration of the foregoing and the record as a whole, we affirm the trial court's judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE